Case number 14-1207, Association of American Railroads Petitioner v. Federal Railroad Administration, et al. Mr. Dupree for the petitioner, Mr. Perry for the respondents. Mr. Dupree for the petitioner, Mr. Perry for the respondents. Mr. Perry for the petitioner, Mr. Perry for the respondents. Mr. Perry for the petitioner, Mr. Perry for the respondents. Mr. Dupree for the petitioner, Mr. Perry for the respondents. Good morning. Good morning. May it please the Court. Tom Dupree on behalf of the Association of American Railroads. We are here today challenging a letter ruling from the Federal Railroad Administration, holding that the hours of service clause apply to individuals who run an automated self-test function on cab signal systems. We are asking this Court to vacate the letter ruling because it is contrary to the plain text of the statute, because the agency has improperly jettisoned its longstanding, narrowing construction of the statute, and because the agency has now acknowledged before this Court that its letter ruling contains a fundamental error. It assumes mistakenly that the agency had already decided the question presented in this case. Mr. Dupree, you argued that the self-test does not affect the safe functioning of the system, and I wonder what is the purpose of this testing if not, in fact, to assure the safe functioning of the system? Judge Potter, maybe I could clarify what we mean there. What we mean is that the employee's operation of the self-test doesn't have a direct impact on safety. The self-test, as its name suggests, means it's an automated test. It's the computer that's doing all of the testing. The human operator's role doesn't play a role on safety because if he or she messes it up, the system itself says something's wrong here. I know that there's in the record a video and some information about this test. Is there information sufficient from which an agency could discern, could verify what you're saying about the fail-safe characteristics of this test? I believe there is, Your Honor. I think that both the video as well as other documents in the administrative record demonstrate that. I think the video is probably the clearest aspect of it. But one thing I would point out to Your Honor is that none of the reasoning that the government puts forward in its appellate brief where it discusses whether this is, in fact, fail-safe, none of that reasoning appears in the agency's letter ruling. And, of course, as this Court knows, it upholds or vacates the agency order based on the reasoning the agency offered, not what's in their appellate brief. I actually had sort of a basic question about that that isn't, I know it isn't really the way that the case was briefed. But you were seeking, in effect, an exemption from ruling from them that you wouldn't be covered by what had traditionally covered all testing. And you're saying, look, testing's changed. We've got this automated fail-safe test. We're not in that world anymore. So can you assure us in advance that we wouldn't be covered by this? And they said no. Isn't it your burden in that situation to show that you warrant different treatment rather than their burden to justify why they aren't giving you that exemption? I mean, I'm just wondering about sort of given that what you're seeking is a little different way, an updated way of operating given the new technology. Well, I certainly agree with Your Honor's point that this is an updated way of operating given the new technology. But I think I would take issue with the notion that we were somehow seeking an exception from the rule that has prevailed. As Your Honor knows, what the agency has said year after year after year is not that all testing is automatically covered. They have never adopted a per se rule saying testing is covered. Quite the contrary. What they have said is ordinarily we deem testing a covered service, ordinarily meaning in many cases, perhaps most cases, but not all cases. But haven't they also said that they've never before taken out of the hours of service coverage any testing and engine testing like this? See, I'm not sure I agree with that characterization of what the agency is saying, Your Honor, because again, I come back to the word ordinarily. Because to me, ordinarily suggests that in most cases, yes, but in some cases, no. And so if in fact, as Your Honor posits, they've always said in every case testing is covered, they wouldn't have said ordinarily we think testing is covered. The fact that they say ordinarily suggests that there are situations where testing is not covered. That's been their approach. What they do is they approach this very sensibly on an individual case-by-case basis. That's what they did in the SEPTA proceeding, which is in the record, where what they did was they flooded the zone with inspectors. FRA officials went to SEPTA's rail yard. They sat in. They looked at the guys operating the test. The FRA lawyers got into the chair themselves. They did the tests. So that's how they normally adjudicate these cases. They do an individualized determination so they understand the technology and what's involved in running it. Did you invite them to do that with your UltraCab, too? You should ask Your Honor. They've actually done that after we filed our appeal in this court, and they saw our brief. But did you invite them? Oh, absolutely. We invited them. We wanted them to come. We showed them the video. We had a meeting. I mean, it's, you know, any time they want to come, and as I said, they've actually now, subsequent to our filing the brief in this court, they said, oh, after we pointed out their mistake that they thought they had already ruled on UltraCab, at that point FRA sent a battalion of lawyers out to the rail yard to actually inspect the technology, which is obviously what they should have done before they issued the letter ruling, because that's the approach they've consistently taken for decades. You've been describing it as a letter ruling, and I guess there is an antecedent question about whether it's a ruling, and a ruling that has any binding legal force in the way that we normally require for something to be final agency action. So let's assume that it's the consummation of the agency's process. So for the first prong of the two-prong test, we say that it's gotten finality with respect to that. But on whether legal consequences flow from it, can you address that, given the predicate that A, this agency, according to both parties' understanding, lacks rulemaking authority, and B, that our cases say that practical consequences that follow from a ruling won't suffice to constitute legal consequences for finality? Absolutely, Your Honor. I think there is a very tangible legal effect here. The FRA, to be sure, as we all agree, it does not have rulemaking authority under the statute. But what it does have, in fact, this is one of the things that distinguishes this case from the American tort reform case that Your Honor cited in your briefing order. But what the agency does have is enforcement authority against us and adjudicative authority against us. This is a situation where our regulator, the people who enforce these, who sanction us with penalties, and who then subsequently adjudicate these proceedings, come to us with a ruling, and they say, comply with our legal interpretation. Are they, in fact, required to do that? Is it binding upon them? The safety inspector who would do this, is this what you call the letter ruling? Is that binding on them, or do they have discretion when they come at this? The agency appears to treat it as binding, Your Honor. They have told us, and I'm confident my colleague, Mr. Perry, will agree with us, that it is the agency's position that railroads need to comply. In fact, one other point I would make, going to your point, Judge Srinivasan, is we have already been sanctioned and penalized and issued notices of violation based on the legal interpretation in the letter ruling. What does that mean, you've been issued? I don't know what that means. Yes, since the letter ruling. I don't know what that means. What that means is that means that earlier this year, in 2015, one of my clients, CSX, received a notice of violation from the FRA, saying the violation is you didn't track or comply with the hours of service statute with regard to the UltraCab 2 self-test. But what does that do? What that does is... What follows from that? What follows from that is that then we get subject to an internal agency proceeding, where the chief counsel's office brings you in, and they basically say, we are assessing $10,000 in penalties against you. Typically, the way this works in practice is that... Do they have assessed penalties? They have given us a notice of violation. The way this typically works is that there are often many violations over the course of the year, and so ultimately what happens is the railroads come in, they sit down with the chief counsel's office, and they resolve, they negotiate a solution. So that's the compromise process. That's typically how it works. But as I understand it, and correct me if this is a misunderstanding, as I understand it, they do issue this notice of some variety that says you're subject to a particular penalty. But that's not self-executing. And so the way that that penalty gets actually meted out is that there's an enforcement proceeding that comes. And that enforcement proceeding, they have the burden to show that you're, in fact, subject to the penalty. Now, of course, there's this compromise process. I get that. That's a practical consequence. You can compromise it if you want to. But if you don't, you go to the enforcement proceeding. At least they have to go to the enforcement proceeding. And if they go to the enforcement proceeding, it's the burden's on them to prove that their understanding of the law is correct. But, Judge Narvasan, I don't think this case is terribly different than the Supreme Court's decision in Sackett where you had the EPA basically saying, we think you're in violation. And the agency in that case said, well, we're not sure this is final agency action because nothing's going to happen until the enforcement proceeding. And the Supreme Court said no. But I think in that, the difference, I think, is that that agency has rulemaking authority. They could issue pronouncements with the force of law, whereas this agency doesn't. But when you say pronouncements with the force of law, we, as a legal matter, we are required to comply with what they are telling us or else we are subject to enforcement. No, I think you're not because I think, as I understand it, you're required to comply with the law for sure. But what they're telling you is the law is not the law until a court in an enforcement proceeding says it is. And they don't get Chevron deference to their interpretation even. Well, but I think, I mean, my understanding is if an enforcement agency and also the initial adjudicators in this say, this is our interpretation of the law, we require you to comply or we- Is that right? When the adjudicator is in that proceeding, will the adjudicator look at this letter ruling and say, this is the law? That is what the FRA has told us. Well, it's the same entity that's doing it. The FRA's chief counsel's office is effectively the adjudicator in these proceedings. So it's a situation where- And they will consider that letter, what you call the letter ruling, they will consider that law. That is certainly what they've told us, and that is how they appear to be operating. I mean, it's possible my colleague will say that they're disregarding the law, but in practice they've been enforcing it against us. How is it different from a prosecutor? So you have a prosecutor who says, here's my understanding of the law. I think you're violating the law. And then I have the superior authority in my office. Let's call him the adjudicator or the adjudicator. And the adjudicator says, yeah, that's our determination of what the law is. And then you as the regulated person just say, okay, that's interesting. I don't care. And then they have to bring a case in order to cement that, no? But I think the fact that there may be enforcement proceedings on the back end doesn't suggest it's not final agency action. I think possibly one of the clearest authorities on this is the Seventh Circuit case, on-bank decision, you cited in our briefs, the Atchison-Topeka case, which- Right, so I don't- I know that case, and you're right that that case says that. But then if you look at our decision in the National Association of Hold Bidders case, I think it was cited in the order that we issued. So in that one, it was similar in that there was practical consequences that definitely followed. The agency had issued an interpretation that lacked binding force, but that agency actually could issue interpretations with binding force. It just didn't in that instance. And it had practical consequences that were asserted because the regulated entity said, look, you've told us what you think this means. We have to do this or else we're subject to an enforcement proceeding. And in that enforcement proceeding, we're on the hook. And the court said, well, it's too bad. You have to-it's true that you're practically at risk, but that's just the nature of the beast. Well, I guess I'd make two points, Your Honor. The first is with regard to the Seventh Circuit point, which I think Your Honor acknowledges, at least supports us. Again, same agency, same statute, same sort of letter ruling. And, of course, that case went up to the Supreme Court, where the Court, as this Court knows, needs to ascertain its own jurisdiction and be satisfied that there's final agency action. And the Supreme Court affirmed the Seventh Circuit on the merits. I don't think they addressed this issue. Is that right? That's true. You're saying by implication because they have to verify their- They have to address it. Let me ask you. I'm just really curious about what you said about how they came down after the letter ruling to take a look at the Ultra Cab 2 and get familiar with it. I mean, it feels non-final to me in the sense that are they doing that because they love trains, which I know they do. But surely they're doing that because they're in an ongoing process of educating themselves about the claims you're making and are open, perhaps, to persuasion once the rubber hits the road in enforcement. Are you saying that's not how you understand it? Well, that's not how we understand it, Your Honor. And here's another question going to that. Yes. Is have they, when they've said, you know, you violated here, you're obligated, you're on the hook for $10,000. That's in the range for non-willful violation, right? I believe that's right. $25,000 or over for willful. So they're not really saying, like, in the face of a definitive ruling on our part that this is covered, you're nonetheless not complying. I mean, so there's-I mean, I think if they were taking the position that your noncompliance in the face of this letter bumped you up into willful fines, that would be more final in my view. Well, Your Honor, I think regardless of whether we get sanctioned a mere $50,000 or $200,000 for a willful violation at the end of the day, it's a very substantial penalty. No, but I think Judge Pillard's point is that if it were bumped up to the more substantially serious penalty, that would indicate that the agency thinks that you are bound by its letter ruling because you would have looked at the face of something that should regulate you and you would have said, I don't care. Well, but I believe, and again, my good friend Mr. Perry will correct me if I'm wrong, I believe it is FRA's position that this is their final and definitive ruling on this. They've never said anything to the contrary. As I read home builders, one of the key inquiries is whether the letter ruling cabins prosecutorial discretion. Does this? It certainly appears to in the sense that it is a letter from the agency. I believe they're a top safety official saying that this particular function, which is running the self-test on the Ultra Cab 2, is covered service, period. And when we are given that letter ruling. I'm not interested in you right now. I'm interested in the prosecutorial discretion of the safety inspector. Well, again, I can't speak to whether the FRA views themselves as having prosecutorial discretion. But I would say this, from the view of the regulated party, Your Honor, with respect, it would be cold comfort when we're given this letter. But that gets to the practical consequences versus legal consequences. And as you know, practical consequences doesn't end the inquiry. It's necessary, but it's not sufficient. We have to look to whether there are legal consequences. And I'm asking for your help in understanding how home builders informs our analysis here. Because home builders tells us one of the factors we look to is whether there's a cabining of the prosecutorial discretion. If there is, legal consequences have flowed from it. You have more likely to have final agency action. So I'm asking for your help. I'm just not aware of anything that would give them prosecutorial discretion on this. They have always come to us as an absolute, Your Honor, comply or be sanctioned. Mr. Dupree, I have a much more basic question, which is, how is it that these employees would not otherwise be covered? Because the hours of service rule applies to railroad employees. Who are these people that do these tests? Well, I think the answer is they are railroad employees, but who fall outside the hours of service provisions. The hours of service provisions are fairly narrowly drafted. They certainly do not encompass all railroad employees. If they did, frankly, we wouldn't be here. Where this ruling, this letter ruling, has bite, it applies as to those employees whose only thing they do during a 24-hour provision that's even arguably covered service is this four-minute self-test. That's it. So it's not the people who drive the trains who do it. And it's not the 21-103 covers train employees? They're also not train employees. These are individuals who don't qualify for any of the possible covered service activities. If it were, say, a train engineer who's covered and he runs a self-test, we don't care about that. They don't care because he's already covered. Right. So who does that? I'm just curious. Who is doing this? It could be someone who just works in the back office and monitors who's coming in and out of the building, and he's got five minutes and he goes out and he runs the self-test. And then, bang, he automatically becomes a covered employee, which brings down a whole host of regulatory requirements on us. So you don't have a sense of what the regular routine is, who these people are? It varies by railroad, Judge Pillard. It varies by railroad. And, again, in cases where it's someone who's clearly a covered employee, we have no gripe about this. This is people whose only arguably covered function is that four-minute self-test. And by virtue of that four-minute self-test, they get swept into this entire regime. I'm into my rebuttal time. I hope I can preserve some, and if possible, I would love to address some of the merits very, very briefly with the Court's permission. Sure. Go ahead. Thank you. We have put forth three reasons why we think this letter ruling should be vacated. The first is we believe it's contrary to the plain language of the statute, which does not apply to testing activities. We've alerted the Court to a companion provision in the Federal Code in Title 49, in which Congress treats signal systems maintenance as distinct from signal systems testing, which tells us, consistent both with common sense as well as common usage in the industry, that these are different functions. So we don't believe the agency had authority to sweep testing within the provisions of the statute. The second point is we believe that the agency has improperly abandoned its long-held narrowing construction. Within its letter ruling, the agency said that it believed its longstanding test was no longer necessary and that it was an on-again, off-again switch, where it simply declined to apply its longstanding test in this case. Wouldn't the most elegant way for us to reach the merits be relying on your argument about the SEPTA ruling? Yes. That we haven't yet seen the FRA give any reasoned decision-making about the ULTRACAB 2, right? That's exactly what the judge referred to. Why did you put that third in your argument? That was your third argument. You gave two pages to it. Well, we wanted to save the best for last, Your Honor. I see. In all seriousness, the reason why we put it last is because at least if the Court makes a decision that doesn't color everything. We don't have anything. So the argument would go. I hope I don't mess up your argument for you. But so the argument would go. In light of that, everything else that we have in front of us has been skewed. We just don't know what the decision-making has been. I completely agree, Judge Griffin. But I take it if you went on your statutory argument, then the agency wouldn't even have discretion. Well, that's where I was going to go next. Judge Srinivasan is right. That's the go-big theory of your case. If the Court were on statutory grounds, that would preclude the agency from regulating testing per se. Can I ask you something about the ground that's less beneficial to you, the one that Judge Griffith was alluding to? Is there some process, informal or formal, in the agency to write a follow-up letter or to communicate to them? Look, you issued us a letter. It focuses on variety of testing, A. And the letter purports to say that that's what we're dealing with here. But actually, it's just to remind you it's variety of testing, B. Well, I suppose nothing prevents us from sending a letter to the agency. And, frankly, the agency in its own discretion, we thought there was a possibility once we pointed out in our briefs the error, that they might acknowledge the error and simply withdraw the letter. I'm just wondering if there's anything pre-petition for review, was there any back and forth about this? Here's the thing, Judge Srinivasan. When we first got that letter, we were not parties to the SEPTA proceeding. We didn't know. And so when we got the letter, we said, oh, my goodness, they've already decided this ultra-cab and the SEPTA proceeding. And then, lo and behold, when we filed our petition for review, we got the administrative record. We looked at the SEPTA proceeding and we kind of struck our head and we said, oh, my God, it's a different system. They got it completely wrong. And so, no, we didn't realize until we got the record that they had just completely gotten it wrong. And I think, I mean, look, this Court obviously sees a lot of administrative law cases. I've been involved in a lot. This is pretty clear agency error. They thought they decided the question when, in fact, they hadn't. So I agree, Judge Griffith, the most elegant way for this Court to resolve this case is simply to say it proceeded on the false assumption, they've already decided it, vacate, and we go back. Thank you. Mr. Perry, could I ask you to address the threshold question first, whether this is final agency action? Yes, Your Honor. Christopher Perry of the Department of Transportation. I'm half of respondents. Your Honor, it's the agency's position that this letter ruling that's under review did constitute final and reviewable agency action and that this matter is ripe for the Court's determination now. Looking at the Court's traditional analysis under Bennett v. Spears in the first instance, as Judge Schwinnervassen mentioned, this was the consummation of the agency's decision-making process. It was a letter ruling by the Senior Associate Administrator for Safety, who is the Chief Safety Officer of the Federal Railroad Administration. It's a senior competent official to make this kind of determination, someone who's very familiar with hours of service determinations, and there was no expectation when the agency put out its letter that there would be any further pronouncements on the issue, nor was there any obligation on the part of AAR to submit anything. What are the legal consequences of it? How did it change the legal terrain? Well, I think in the first instance, Your Honor, as Mr. Dupree mentioned, this letter ruling, or the interpretation that came from the letter ruling, is being relied upon by the agency as a basis of its enforcement. To go to the question that was posed in the Court's order from Monday, it's not of any consequence that the agency doesn't have rulemaking authority with respect to the specific definition that comes under the statute. The agency undoubtedly has interpretive authority. It has the ability to interpret the meaning of that statute, and it has to be able to do that to carry out a meaningful enforcement regime. So that was equally true in Home Builders. The agency that issued the pronouncement relied on, could have relied on it in a subsequent enforcement action. Yeah. I think one thing that makes Home Builders distinct, Your Honor, is in that case it was very clear from what the agency was doing that it was a tentative action, and it was actually styled as a recommendation. But I don't think in this case that it ultimately matters, particularly taking account of what the Supreme Court has said in Abbott Labs, which involves the very related, substantially overlapping question of ripeness, it has to be looked at from the perspective of the practical consequences. And in this instance, with this letter ruling, the railroads are every day under an obligation to schedule their operations and to make labor arrangements that conform to this letter. This is done from the agency's perspective. There's no need to await an enforcement proceeding for this to come up in a concrete case, because the agency is not going to revisit in that enforcement proceeding the discrete question that it decided in this letter. And in that enforcement proceeding, which you would have to bring in order to activate any penalty, right? Well, to be clear again, Your Honor, to explain how the enforcement works, as Mr. Dupree mentioned, there is a compromise process that ends up happening at the end of the fiscal year covering the variety of different types of safety violations that the railroad is being looked at for, not just hours of service, including hours of service, but going beyond that. And my understanding from speaking with the agency is that compromise process resolves things all the time. Sure, like plea bargaining does. But it's under the shadow of the law. It's going to matter what the law is. And it seems like a very peculiar position for the agency to be taking, that it is willing to stake its interpretation on this extremely thin record. I mean, what can you point to that shows that this UltraCab 2 test procedure actually involves skill, that it actually affects safety? Well, it certainly affects safety, Your Honor, and that's clear with any signal system. Well, when they say it doesn't actually, because if it's not done properly, I mean, if it's not done properly, it's fail-safe. It's going to shut down. The train will not move. We disagree with that, Your Honor, and that's a determination over which the agency's expertise and experience. You don't have a record on that in this letter. So I'm really surprised that you want to stake your regulation on this record. We do, Your Honor, because we feel that we have sufficient information from which to make that determination. And the agency knows how this system operates. It received this additional evidence from AAR now. But the point being, not just how this system operates, as a matter of law, as a matter of the agency's regulations, the system can't be fail-safe because the agency doesn't simply accept a computer printout from a system like the UltraCab 2 to suffice for a test. So whose burden is it? So I was asking Mr. Dupri, I'd ask you the same question. Do you think it's their burden to show that this does not involve the kinds of safety considerations and high level of skill that your interpretation adverts to, or is it your burden to show that your interpretation applies to this situation? I believe it's their burden, Your Honor, and that's particularly the case in this context, because what AAR was asking the agency to do was to depart from the general principle that the agency's been applying since 1977. Well, it's their burden in the context of what? Are we talking about an enforcement action? No, Your Honor, not an enforcement action. But the sort of seeking a safe harbor in advance kind of thing, which they were doing. Correct, Your Honor. In other words, when, as in this case, AAR comes back to the agency and says, we want an interpretation that's effectively going to provide us with relief, regulatory relief, and that will get us off the hook, will save us money, will allow us to schedule operations in a different kind of way, the question becomes, you know, why should the agency depart from the way it's been treating this issue forever? What the agency said in a Federal Registry notice that's Joint Appendix 1 going back to 1977, we're not going to carve out testing from the statute, because in the ordinary course we think that that is critical to system maintenance. And that's what the agency did here. It just so happens that the agency made it explicit with respect to a new form of technology. Does the agency view itself bound by the letter? Yes, Your Honor, in the sense that the agency has no expectation that it's going to revisit the question that the letter was based upon, at least, you know, in any foreseeable circumstances. So to make it more clear, if we're going to an enforcement proceeding later on this year, let's say, if there's a violation that depends upon this specific interpretation of the statute, the agency's not going to revisit this question. What about the willfulness question? They say on page 2 of their brief, without citation, agency officials have specifically warned that freight railroads must comply with the August 18 letter ruling or face sanctions for willful violations of the hours of service laws. Is that your position? I don't know when that specifically happened. I can say that the agency does expect the railroads to comply with that. Now, whether or not the agency would call that a willful violation to which additional consequences attach, I can't say that in this context right now. But the agency does expect that the railroads will comply with this. Does the agency consider it to be willful when you issue a letter that doesn't have the force of law, but you issue a letter and a regulated entity says, that's interesting, that's your interpretation. That's not my interpretation. I'm willing to stake my reputation on an enforcement proceeding. And then would you say, well, that's willful because you disagreed with us, what we said in the letter, which by our own estimation doesn't have the force of law. I think the agency has the ability to do that, Your Honor, but I don't know that the agency necessarily has to. And I also don't know that it's necessarily of legal consequence to the finality determination that it wouldn't. I think it has the ability to do it. I think the more important point, again, looking at it from a practical consideration point of view, is the affected community, the regulated community, has been, is, and will continue to be on the hook for the interpretation. I just want to make sure that I'm perfectly clear here. So you're saying in the enforcement proceeding, the letter ruling will be the law that will be used to adjudicate the dispute? Yes, Your Honor. Again, for the foreseeable future. Well, it can't be the law. It's not the law. What you mean, maybe I misunderstood the question, but is it, if the question, it seems to me there's two different questions. One is whether you're binding yourself to carry forward that same interpretation, which that's a question that I think you were asked. But another question is, does that agency constitute law? Does that letter constitute law in the proceeding? I don't understand how that could possibly constitute law in the proceeding. Well, it constitutes the agency's interpretation of the law that it's applying for purposes of carrying out the enforcement regime. So for purposes of agency enforcement, it would be the law and for purposes of the court? It would be the standard by which the adjudicator will resolve the dispute. Correct. With the understanding, Your Honor, that's the case for the foreseeable future. A party could come back and seek a different determination from the agency. We just don't have any basis to think that that's what the agency's going to do unless there was some real change. But when the adjudicator resolves the dispute, what is that? The adjudicator, does anything happen? Is there anything that follows from the adjudication of this? Again, Your Honor, to answer your question, because of the compromise process, it becomes very difficult to even talk about it in terms of an adjudication as we would typically think about it in agency practice because when the railroads actually pay to compromise, they're not making any admission that they actually broke the law or anything in that event. Right. And in my experience, and speaking with the agency about it, it's been at least 20 years since there was any further proceeding based upon a disagreement that came out of the compromise process. So practically people compromise in the same way that practically parties settle. Correct. Correct. If I may, Your Honor, with my remaining time, I do want to address some of the points on the merits if I can. Turning first to AAR's broad legal argument with respect to testing falling under the definition of maintaining, installing, and repairing signal systems. In the first instance, the court doesn't need to reach that argument on the merits, and it shouldn't reach that argument on the merits because that was not an issue that was presented to the agency in the proceedings below. In fact, that has been the way the agency has looked at that for 40 years, and if the court were to change that now, that would be a much bigger issue than anything else that we're dealing with in this case. All that AAR did when it requested a meeting with the agency, and all that it did in presenting its PowerPoint presentation and its video, was to say we want the agency to look at its interpretation as it applies to this new form of technology. And, of course, the last technical bulletin, which is sort of the best source of how the agency views the issue, goes back to 1999-2000, when the form of technology that we're looking at here really wasn't in use. Imagine, I know this is counterfactual, but imagine that you had a full record that established that the UltraCAD II could be operated by a 4-year-old, that all you had to do was go in and push a button, and that, in fact, it really was fail-safe. If anything was not done properly, that completely verified the safety of the engine. It wouldn't be able to go anywhere. In that situation, would it be covered by the hours of service law? Your Honor, it depends because it goes back to the question of whether or not a human being is able to certify that the test was done correctly. And that's what this comes down to. Let's say the test itself can so certify, correct, incorrect. And so all you have to do is when the engineer comes on the train to actually, I don't know if it is the engineer who drives the train, but it's the person who drives the train gets in her seat, and it'll just say test performed or not performed. Right. Covered or not covered? It depends upon whether or not the person who's pushing the button is the person who is signing the statement required by agency regulation to say that a test has been properly performed, meaning that a test of the system has occurred and it ensures that all of the different safety requirements that are in the CFRs are met. So if one person just pushes a button and does nothing more, that's one thing. What the agency requires is for someone to actually be watching the test as it's done and using their own independent judgment and expertise to make sure that it's done correctly. So it may be that as technology develops, it will be that the driver of the engine can jump in the cab, see that it's done, and sign that form. It is possible someday, Your Honor, depending upon a number of different changes with respect to technology, with respect to the way this operates and how the agency understands those forms of technology. As always, we're trying to catch up with the technology as it develops and figure out what we do with it within the regulatory regime. Maybe your opponents think that day is already here. And we disagree, Your Honor, and we believe that it's our ability and really our prominence to be able to make that determination as a matter of expertise. As just one example that was mentioned in the letter with respect to calibration, we mentioned again in our brief, there are speed restrictions that apply along different areas of a railroad that's in coded cab signal territory. In other words, those portions of the railroad where there is electronic circuitry that is on the rails. And they say that's all taken into account. Right. Tests for every place. Right. We disagree because even if this test is going to be run for all those different territories, the human being who's testing it must be watching to make sure that the computer is doing the test according to the actual correct parameters that are required by law. So it's not a self-test. It can't be a self-test. There has to be a human being who is actually making sure that the test is being done correctly. Furthermore, Your Honor, it's not just that it's overseen in that way. The person who's doing the test is not merely clicking a button, but is actually taking other steps that are like hardware steps, not like clicking on a mouse to install computer software. In this instance, they're actually talking about manipulating locomotive controls, including brakes. How do you respond to your opponent's argument that your decision here was based on the wrong test, that you've never tested UltraCab 2? Well, Your Honor, going back to the SEPTA proceeding, the agency in its letter in this instance said that the SEPTA proceeding involved an UltraCab 2. Now, that's essentially a factual determination. It's correct that in the record in the SEPTA proceeding, which consists of nothing more than SEPTA's request letter and the agency's response, that doesn't specifically mention the UltraCab 2. I think it mentions Harman, my understanding from the railroad experts is. Harman makes UltraCab 2 and other systems like it. But I think at the end of the day, it doesn't make a difference, Your Honor, because as the agency said in its letter, it didn't just exactly look at it and say, oh, this is precisely the same, we're bound to do exactly the same thing. The agency noted that it had taken consideration of additional evidence and information that had been provided by AAR. And it said to the extent that that differed from what it had already received in the SEPTA proceeding, that distinction didn't matter for purposes of the agency's decision. I mean, that argument makes perfect sense if the position of the agency were we tested this thing once, you're giving us some new arguments as to why the thing we already tested, we reached the wrong result as to that, and you say, well, the new stuff doesn't convince us that our test of that thing was wrong. It's entirely different to say we tested a different thing, but actually in our ruling, in our letter ruling, we're saying that we tested the same thing. That seems like an entirely different set of circumstances. Well, I think, Your Honor, it's sufficient that in this case the agency looked at the SEPTA proceeding, which is the closest thing that it had before it, where the request for relief and the information that was provided by both parties were so virtually the same with respect to the legal issues that were presented and also the factual issues. The agency could additionally depend upon its own expertise and its experience out in the field looking at these systems. It's not to say that the agency... It definitely could. It definitely could, but the question is what did it do? And if you look at this letter, what this letter does is it says we already tested this. And unless you're taking the position, and it sounded like you were starting to take it, that in fact the SEPTA proceeding did involve a test of the UltraCab II, that just seems to me to be a different issue. One reading of the letter is that it says we tested UltraCab II once already. We reached a determination. Now, if that's the reading of the letter that's on the table, are you taking the position that the letter can be sustained? Well, yes, Your Honor. My position is the letter can be sustained either way, and here's the reason. The letter that the agency put out here said that the SEPTA proceeding involved the UltraCab II. If you go back to the record in the SEPTA proceeding, which only, again, has two documents in it, it does not specifically mention the UltraCab II. Did the SEPTA proceeding involve the UltraCab II? My understanding is, yes, it probably did, but I cannot... Probably did. I cannot completely tell it to the court because it's not in that record. What I do know is that the Harmon system that was being looked at... But you would tell us that we should affirm a letter on the basis that the agency said it involved the UltraCab II, even though, as you stand here today, you're telling us you don't know if it did. Your Honor, the other point, of course, is that we have to look at the record as it's written, and I have to say that the record as it's written doesn't make specific mention of the UltraCab II, so that's what we need to look at. Is it not? So I was a little confused about that. Is the U.S. That's the UltraCab II cab signal system. Yeah, I thought that was the UltraCab II. It is. So the letter, this is JA 70, talks about that in a prior request for a waiver of the hours of service law with respect to the US2CSS docket number, and that's referring to the SEPTA case, right? Right. Found that. So this letter does assert that the SEPTA situation involved the UltraCab II, and you're saying, standing here today, you actually don't have any reason to doubt that. You don't have reason to verify it, but you also don't have reason to doubt that. That's exactly correct, Your Honor. I want to be clear. It's my best understanding from speaking with the folks who deal with this issue day in and day out at FRA that they believe that the SEPTA proceeding did, in fact, involve an UltraCab II, and Harmon, which is mentioned in the other, makes both. The point that I'm trying to make is it's our view that that doesn't actually matter because the agency made clear that it wasn't just making its determination on that basis. But it was at least making its determination a part on that basis. It was making it a part on the basis. And once you do that, aren't we in the land of wondering whether the ground that's left is independently sufficient to sustain the agency's determination? I don't even think the court needs to get to that, Your Honor. Even if it did, I think there would be plenty of independent basis. But in this instance, Your Honor, the agency made specific note of the fact that the technology that we're talking about here, the agency took account of all the evidence that it got and it made all relevant comparisons that it needed to make between what it got in this proceeding and the information that it got in the other proceeding. So to sort of say in this instance, you know, well, the agency sort of didn't take... Right, but it assumed that what it was doing in the other proceeding is testing the same thing. And it turns out that at least we don't know that it was. Well, Your Honor, again, going back to Judge Cohen's point, I'm trying to be very clear. There is nothing in the SEPTA proceeding that especially mentions or specifically mentions the UltraCab 2. Right. My understanding from speaking with our enforcement folks is the other proceeding did mention the UltraCab 2. I can't verify it on the basis of the record that existed there. And your overall position has to be it's their burden. Indeed. So to the extent that the record is limited, to the extent that it's unclear what it shows, they haven't jumped high enough to get a safe harbor from you in advance of whatever enforcement actions might proceed. What's curious to me is that you're also taking the position that this is definitive, even though you're going out and looking at the UltraCab 2 on site. And it may be that when you get more information in the context of, as I gather, the negotiation or whatever your further interactions are going to be with AAR, they may change your mind, but you're saying no. Correct, Your Honor. Let me first address the point with respect to the site visit. The site visit occurred after the petition here was filed, and the purpose of that site visit was not to re-adjudicate the issue or was not to revisit the issue. The purpose really, as I understood it, and it was really for my benefit, was to give me a concrete illustration of what this is and how it works, because I had no idea what this was about and didn't know anything about the issues. Yes, Your Honor. At least that's the way I was viewing it. I certainly wasn't going to make any further determination or change the view in this case. I didn't know anything about these systems before this came into play and didn't know anything about the letter. It's helpful, but the agency had no further process that it was going to undertake with respect to going out and doing that kind of visit. It got delayed for different reasons, scheduling reasons and so forth. It's true that it ended up occurring, I believe, after AAR's opening brief was filed, but there was no particular reason for withholding on that basis. I think it was requested earlier. I don't want to make too much of the site visit because it was really, as I understand it, and it was really for my benefit among some of the other folks, for illustrative purposes. But the agency, again, is not going back to make a different determination in the foreseeable future on any of the issues that are raised in this letter. And if there were a future enforcement proceeding, there may be other factual issues that could get looked at that would go to whether or not an hours of service violation occurs, but not as to the specific issue that was addressed in this letter. If there are no further questions, thank you very much. Thank you, Your Honor. Just briefly, I think one thing all of us can agree on is that this two-page letter is not a model of agency reasoning. This is an immensely important issue for the industry, and we are in a situation where I think Mr. Perry, to his credit, conceded that he simply can't say whether the agency was right when they claimed they had already adjudicated this question. Obviously, the agency has the burden of coming up with substantial evidence supporting its reasoning, and when their lawyer stands before this Court and admits there's nothing in the record that suggests the SEPTA proceeding concerned UltraCab, Mr. Perry said the record doesn't specifically mention UltraCab. Translated, it doesn't mention UltraCab. There's no mention of it at all. And the fact that even today, having had the benefit of months and months and months to talk with his clients, talk to the people who did SEPTA, he still to this day cannot say definitively whether or not it involved UltraCab I think is sufficient for this Court to vacate the ruling. Judge Pillar, your point about the agency's thin rulemaking record, that's absolutely right. Mr. Perry spoke about the agency's expertise and judgment and all of that, but none of that is evident in this letter. This Court obviously reviews the sufficiency of the agency's action based on the record that the agency created and the record of the reasoning set forth in the agency's ruling, none of which is present here. We believe that this Court should vacate the letter. As to the point about finality, I think Mr. Perry said it well, that the agency views this as binding, that there's no going back. This is their final determination. We've already been subject to sanctions proceedings. No one's ever actually litigated an enforcement action in more than 20 years. And, of course, the Seventh Circuit has already held that an FRA letter ruling construing the hours of service statute is final agency action affirmed on the merits by the Supreme Court. So for all those reasons, Your Honor, we believe this letter is deficient. The agency should be sent back to do it over, and we ask that this Court vacate the letter ruling. If there are no further questions. Thank you very much. The case is submitted.
judges: Griffith, Srinivasan, Pillard